**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**


A HELPING HAND, L.L.C.       :
                        :
                        :
    v.                  :          CIVIL ACTION NO.
                        :          CCB-02-2568
                        :
BALTIMORE COUNTY, MD., et al.      :
                        :
                        :
                        :
                        :
                        :

**<u>MEMORANDUM</u>**

Now pending before the court are cross-motions for summary judgment. (*See* docket entry nos. 56 and 57.)  The plaintiff, a private methadone treatment clinic operating in Baltimore County ("Helping Hand"), filed suit against Baltimore County defendants ("the County"), alleging that the defendants intentionally discriminated against the clinic by passing a restrictive zoning law in violation of Title II and Title IV of the Americans with Disabilities Act (Counts I and II).  The plaintiff also asserts a § 1983 claim on the basis that defendants' actions deprived the plaintiff of property in violation of the Due Process Clause of the Fourteenth Amendment (Count III).  The plaintiff is seeking an injunction enjoining the defendants from enforcing a local zoning law against Helping Hand and requiring the County to remove the discriminatory language from the law; damages in the form of lost revenue that could be set aside for the benefit of the plaintiff's indigent clients; and attorneys' fees.  A previous motion by defendants for summary judgment as to Counts II and III was denied on April 14, 2004.  *See* 2004 WL 868288.

The current cross-motions for summary judgment address Count I only.   The primary issues presented in the parties' papers are whether the clinic's patients are disabled for the purposes of the ADA, whether the clinic has standing to bring a suit under the ADA, and whether the defendants intentionally discriminated against the clinic when they enacted Bill 39-02, a zoning law that the plaintiff asserts has restricted the clinic's ability to operate.   The motions have been fully briefed and oral argument was heard on April 25, 2005.   For the reasons discussed below, neither party is entitled to summary judgment, and the motions will be denied.

I.  *Background*

      I will presume familiarity with my previous rulings in this matter, as they discuss many of the relevant factual and procedural details.   *See A Helping Hand, L.L.C. v. Baltimore County, MD, et al.,* 295 F.Supp. 2d 585 (D.Md. 2003); 299 F.Supp.2d 501 (D.Md. 2004); 2004 WL 392873 (D.Md. 2004); 2004 WL 86288 (D.Md. 2004).   The most pertinent facts, however, are set forth below.   The related opinions in *Smith-Berch, Inc. v. Baltimore County, see* 68 F.Supp. 2d 602 (D.Md. 1999), 115 F. Supp.2d 520 (D.Md. 2000), 216 F.Supp.2d 537 (D.Md. 2002), 64 Fed.Appx. 887 (4th Cir. 2003),  provide additional historical background that is helpful to understanding the present dispute.

      The location and operation of methadone maintenance treatment clinics within Baltimore County has been an ongoing source of controversy.   In 1999, this court ruled that the County's special zoning permit requirements for methadone treatment facilities ran afoul of the Americans with Disabilities Act of 1990.  *Smith-Berch,* 68 F.Supp. 2d at 622-23; 115 F. Supp.2d 520 at 524.  The court held that "while the ADA certainly does not prohibit the County from adopting

appropriate zoning regulations governing the location of methadone treatment facilities, the court

believes that the ADA prohibits the County from enforcing its zoning regulations in a manner

that effectively precludes proposed methadone treatment programs from operating in the county

or that otherwise imposes unreasonable burdens on such programs." *Smith-Berch*, 68 F.Supp.2d

at 622.   Despite this guidance indicating that the County could design and enforce legitimate

zoning regulations regarding the siting of methadone treatment clinics, the County Council did

not address the issue at that time.

　　　Methadone maintenance treatment clinics, which provide methadone and rehabilitative

services for narcotic addicts, including those addicted to heroin or prescription medicines such as

OxyContin, are licensed and regulated by state and federal authorities.   The federal Department

of Health and Human Services regulations that govern the operation of methadone treatment

programs describe this treatment as "the dispensing of an opioid agonist treatment medication

[methadone], along with a comprehensive range of medical and rehabilitative services.   42 CFR

§ 8.2.[1]   To operate in Maryland, a methadone treatment program must be certified by the

Maryland Department of Health and Hygiene's Alcohol and Drug Abuse Administration.   Such

certification is contingent upon approval from the relevant federal agencies.   As part of the state

certification process, a methadone maintenance treatment program must document that its

---

[1] Around the time plaintiff began the process of searching for locations and taking the necessary steps to open a methadone clinic, federal oversight and certification was moved from the federal Food and Drug Administration to the federal Department of Health and Human Services' Substance Abuse and Mental Health Services Administration. See 66 Fed. Reg. 4076.01(Jan. 17, 2001).

location is a permitted use under the jurisdiction's zoning code.[2]

In or around November 2000, Joel Prell, president of plaintiff Helping Hand, began searching for appropriate locations to operate a private methadone clinic in Baltimore County. In November 2001, with the aid of a licensed real estate agent, Prell selected 116 Slade Avenue in Pikesville, Maryland. (*See* Pl.'s Mot. for Summ. J., Ex. 6, Joel Prell Aff. at ¶ ¶ 5-7.) This site had already been used as a medical clinic, and was zoned and approved by the County as a medical office setting with sufficient parking. The office is located in a commercial, medical office setting. Behind the facility is the National Guard Armory which is completely fenced and guarded. A Baltimore County police substation is located nearby in a high rise office building. (*Id.* at ¶ ¶ 9-12; *see also* Ex. 12, Gross Aff. at ¶ ¶ 5-15.) Prior to leasing the Slade Avenue site, Helping Hand's representatives met with Gwendolyn Parker, Coordinator of the State of Maryland Substance Abuse Certification Unit Office of Health Care Quality, to discuss their interest in establishing a methadone treatment program at the site. (*See* Ex. 6, Joel Prell Aff. at ¶ 17) Ms. Parker approved the site, and the plaintiff's site plan, as did Carol Benner, Director of the State of Maryland Office of Health Care Quality. (*Id.* ¶ 18.) Throughout the planning process, plaintiff's representatives met with several state officials who expressed their view that Baltimore County needed more methadone maintenance treatment facilities. (*Id.* ¶ ¶ 19-20.)

Based on the positive feedback from the state, the need for the facility, and the earlier determinations made by this court that the County could not impose discriminatory zoning requirements on methadone clinics, Helping Hand entered into a three year lease agreement

---

[2] At the time plaintiff was seeking approval and until repealed in June of 2002, this requirement was located at COMAR § 10.23.03.04 (A). The applicable state requirement can now be found at COMAR § 10.47.01.05.

(with an option for two additional three-year terms) on February 1, 2002.  The state Office of

Health Care Quality continued to process Helping Hand's application for state certification.

Because 116 Slade Avenue had been established since 1969 as a medical office, the property did

not need a change of occupancy permit or operating permit from the defendant Baltimore County

Department of Permits and Development Management.  In early March 2002, Douglas Swamm

of the Baltimore County Permit Department indicated to both Ms. Parker, the state Substance

Abuse Coordinator, and to plaintiff's representative that no change of occupancy permit was

required, even though such changes were mentioned as a possibility that could be required in a

November 21, 2001 letter to plaintiff.  Based on this information, the state continued the

certification approval process.  (*Id.* ¶¶ 21-25.)

  In mid-March, the Ralston Community Association learned of Helping Hand's intent to

open a clinic at 116 Slade Avenue, as well as the plans of a separate methadone clinic known as

START to open a facility at 110 Reisterstown Road.  (*See* Pl.'s Mot. for Summ. J., Ex. 17,

March 14, 2002 "Pikesville Residents Gear Up to Fight Two Proposed Methadone Clinics" and

March 20, 2002 "A Bitter Battle," Baltimore JewishTimes.com.)[3]  *See generally START Inc. v.*

*Baltimore County, Maryland,* 295 F.Supp. 2d 569 (D.Md. 2003).  The Association "convened an

---

[3]Without deciding whether the newspaper articles would be admissible at trial, I will include information contained in media reports in the record insomuch as they provide relevant background information about the community meetings leading up to the new legislation.  *See, e.g.,May v. Cooperman*, 572 F.Supp. 1561, 1564 n.2 (D.N.J. 1983) (allowing newspaper articles to be introduced as evidence of legislative intent when there was no official record of legislative proceedings and legislators were not permitted to be deposed) *aff'd* 780 F.2d 240 (3d Cir. 1985).  *See also U.S. v. Halifax County Board of Educ.,* 314 F.Supp.65, 75 (E.D.N.C. 1970) (in action challenging constitutionality of statute newspaper articles discussing motives for legislation were admitted for purpose of showing that they did appear but not for purpose of showing truth of information contained in them).

emotionally charged community meeting" on March 13, 2002 attended by about 250 people in

Pikesville to hear about the clinics.  (*See* Ex. 17, March 20, 2002 article.)  Residents and

businesspeople at the meeting "vehemently opposed" the clinics, citing concerns about the

placing of clinics near residential neighborhoods, the impact on property values, the threat of

increased crime, and the fear that schoolchildren would be exposed to drug addicts.  (*Id.*)  (*See*

*also* Ex. 10, Feb. 25, 2004 Kathleen Rebbart-Franklin Dep. at 13-15) (describing community

opposition at the meeting.)  At the meeting, 2nd District County Councilman Kevin Kamenetz

told the audience that the 110 Reisterstown Road clinic had already passed the county zoning

regulations, and that the clinic at 116 Slade Avenue was a former doctor's office and he assumed

that this clinic would also receive approval from the county.  (Ex. 17, March 14, 2002 article.)

Mr. Kamenetz acknowledged that there might be a need for a methadone clinic in Pikesville, but

said any such clinic should not be situated in a residential neighborhood.  (*Id.*) He referenced the

previous court ruling striking down the County's attempt to restrictively zone methadone clinics,

and explained that the county had no authority to stop them from opening, and stated that "[w]e

cannot treat a methadone clinic different from any other medical clinic in the zoning" regulations

because "you cannot discriminate against drug addicts." (*Id.*)  Representatives of the community

associations attending the meeting vowed to fight against the proposed clinics.  A letter-writing

campaign was urged, a petition was signed, and there were calls to boycott any firms with which

the clinic participants were associated.  (Ex. 17, March 20, 2002 article.)  The next day, about

100 people arrived at Helping Hand's open house carrying protest signs stating slogans such as

"No More Crime."  The open house turned into a "shouting match between audience members

and Mr. Prell," who acknowledged this would be his first methadone treatment clinic.  (*Id.*)  The

6

protestors accused Prell of "bringing a criminal element into the neighborhood and his promise to have a security guard on duty during clinic hours was considered proof of that." (*Id.*)  *See also* Ex. 5, "Protestors Crash Clinic Open House," Owings Mills Times.)   Jeffrey Ziegler, President of the Colonial Village Neighborhood Improvement Association in 2002, attended the Helping Hand open house.  He explained that his organization's opposition to the clinic was based on the fact that its members "were concerned that our children would be exposed to individuals, who had been involved in illegal drug use, and we were fearful that the proximity of the clinic to the community and the children that live in the area would compromise effort[s] to discourage illegal drug use by the children in our community." (*See* Def.'s Response in Opp. to Pl.'s Mot. for Summ. J., Ex. 7, Ziegler Aff. at 2.)  Their concern also was premised on "the belief that persons addicted to drugs commit more crimes than persons not addicted to drugs." (*Id.* at 3.) He further explained that "the community had some doubts about Mr. Prell," because his business experience involved running a pizza shop, and he had no "prior experience in the area of dispensing a form of morphine like methadone." (*Id.* at 2.)  Finally, Ziegler explained that community members were concerned that the presence of "a facility that treated drug addicts" would negatively impact property values.  (*Id.* at 4.)[4]

On March 20, as a direct response to the community opposition to the clinics, a delegation of community leaders including Councilman Kamenetz met with Dr. Georges Benjamin, director of the Maryland Department of Health and Mental Hygiene, for two hours.

---

[4]In its reply memorandum, the plaintiff argues that Mr. Ziegler's affidavit should not be considered because it is inflammatory.  (*See* Pl.'s Reply in Support of Mot. for Summ. J. at 20.) I disagree.  Mr. Ziegler is merely reciting his version of the contentious conversations between Mr. Prell and community members leading up to the clinic's opening.  The affidavit confirms much of the information reported in the newspaper articles offered by the plaintiff.

(Pl.'s Mot. for Summ. J., Ex. 17, March 20, 2002 article.)  Many of the same concerns were

voiced at this meeting as at the prior community meeting.  After the meeting, Mr. Kamenetz

stated that he told Dr. Benjamin that the START clinic had its Baltimore County occupancy

permit rescinded on Tuesday, March 19, for technical reasons, and that the Helping Hand clinic

had not yet received its occupancy permit.  Mr. Kamenetz explained that the START clinic could

reapply for the permit but the "state licensing process cannot go forward without those county

permits," and that the County's actions "bought us a little time."  (*Id.*)

On or about April 9, 2002, Carol Benner, Director of the state Office of Health Care

Quality, advised Helping Hand that she had received correspondence from Arnold Jablon,

Director of the Baltimore County Department of Permits and Development Management,

indicating that the zoning application for 116 Slade Avenue had not been approved.  (Ex. 6, Joel

Prell Aff. ¶ 35.)  The plaintiff contacted the County Permits Department and was told that no site

or floor plan had been submitted with its application as they had indicated might be required by

the November 2001 letter, despite the fact that previously the plaintiff had been informed no

additional measures would be necessary to obtain the occupancy permit.  (*Id.* at ¶ 36.)  The

plaintiff contacted an architect who on April 11, 2002, submitted a site plan and floor plan

indicating that sufficient parking existed.  The County rejected the site plan, citing its failure to

meet County standards other than the previously articulated concern about parking.  The

plaintiff's architect drafted an updated plan that resolved the County's concerns and submitted it

on April 15, 2002.  (*Id.* ¶¶ 42, 44.)  Although the architect requested a morning appointment,

the County scheduled the review for 1:00 p.m., at which point it approved the plan.  Immediately

after the approval, Helping Hand delivered the permit to the state Office of Health Care Quality,

which promptly issued a licence authorizing the clinic to begin operations.[5]  At 2:30 p.m. on April 15, 2002, Helping Hand began contacting clients, scheduling appointments, and ordering methadone.  (*Id.* ¶ ¶ 44-45, 47.)

While Helping Hand was in the final stages of preparing to open for business, the County Council was busily drafting a new law that would amend the zoning regulations for "certain State-licensed medical clinics."  The law, known as Bill 39-02, was drafted by Councilman Kamenetz and first introduced on April 1, 2002, "in order to regulate the location of certain State-licensed medical clinics" and to "provid[e] certain conditions for the location of state-licensed medical clinics in certain zones." (*See* Pl.'s Mot. for Summ. J., Ex. 3, Bill 39-02.)  The Bill's preamble explained that "the County Council finds that certain state-licensed medical facilities frequently operate outside the traditional five-day-per-week, eight-hour-per-day schedule, causing potential disruption and inconvenience to surrounding neighborhoods, affecting the safe flow of vehicular traffic, creating parking difficulties in surrounding neighborhoods, and generally adversely impacting the quality of life in these surrounding areas." (*Id.*)  The Bill's stated purpose was to "lessen and control these effects" by "plac[ing] certain restrictions on the location of certain types of state-licensed medical facilities."  (*Id.*)  The law repealed the old definition for "medical clinics," and provided a new definition for "state-licensed medical clinics," which now explicitly covered  "a freestanding ambulatory care facility," "a detoxification facility," and "an alcohol abuse and drug abuse treatment program." (*Id. see* Article 4C.)  The law contained provisions requiring that state-licensed medical clinics

_____

[5]According to Carol Benner, Councilman Kamenetz had called her that same day to tell her the bill was being introduced that night.  (*See* Pl.'s Mot. for Summ. J., Ex. 20, Benner Aff.)

could not be located " within 750 feet of any residentially-zoned property line," and must provide sufficient parking "as determined by the zoning commissioner" based upon the number of employees and "the number of patients served by the clinic on a daily basis." (*Id. see* Section 4C-102.) The law contained a provision exempting clinics "lawfully established and operating" prior to April 1, 2002. (*Id. see* Article 4C, Section 3.) It also contained a safe harbor provision providing that "[a]ny State-licensed medical clinic lawfully established <u>and operating</u> after April 1, 2002 and before the effective date of this Act is exempt, for a period of six months after the effective date, from the requirements of Section 4C-102" but that "on or after that date, all such State-licensed medical clinics, and all clinics established <u>and operating</u> after the effective date of this Act, shall conform to the requirements of this Act." (*Id. see* Article 4C Section 3) (emphasis in the original indicating amendments to the Bill.)  Approximately five hours after Helping Hand received its state license, Bill 39-02 was passed by the County Council at 7:30 p.m. on April 15, 2002.  It was signed into law the next morning by the County Executive.  (*See* Pl.'s Mot. for Summ. J., Ex. 2, Pikesville meeting transcript at 13.)

   The legislative history available in the current record, as well as comments made at a community meeting by Councilman Kamenetz soon after the Bill's passage, shed light on the circumstances surrounding the Bill's development.  In a March 27, 2002 memorandum from Thomas J. Peddicord, Jr., Legislative Counsel for the County to Councilman Kamenetz, Peddicord discussed various "justification[s]" for the law, explaining that the current "clinic draft does not address the issue in terms of volume of outpatients, but rather in terms of hours of operation," but that the "justification is still primarily linked to a traffic concern; it may be necessary to expand upon this."  (*See* Pl.'s Mot. for Summ. J., Ex. 7, March 27, 2002 Peddicord

10

Inter-Office Memorandum.)  Mr. Peddicord explained that he had been calling various non-drug and alcohol facilities to determine their hours of operation "in order to document the bill's justification as stated in the preamble." (*Id.*)  In an apparent reference to the Helping Hand clinic, he stated in the memorandum that "[t]he Law Office is still concerned about the vesting issue, particularly with regard to the facility that does not require a use and occupancy permit and has already...held an 'open house' for the community."  (*Id.*)  At a Pikesville community meeting shortly after the Bill's passage, Mr. Kamenetz explained that the Bill was the County's response to the community's concerns regarding the opening of two methadone treatment clinics.  (*See* Pl.'s Mot. for Summ. J., Ex. 2, Pikesville Meeting Transcript.)  He explained that "I realized we could never suggest that a methadone clinic itself could be treated differently,"' so he carefully drafted Bill 39-02 to regulate state-licensed medical facilities location requirements to ensure there was sufficient parking and limited adverse impact on nearby residential neighborhoods. (*Id.* at 4-8.)  He also stated that it is "very rare that we would have a law that is retroactive," but Bill 39-02 would apply to all state-licensed medical facilities unless they were established and operating prior to April 1, 2002.  The final version of the Bill demonstrates that it was amended so that the six-month safe harbor applied only to clinics "established <u>and operating</u>" prior to the effective date of the law.

According to Helping Hand's complaint, Bill 39-02 was aimed at preventing its clinic from opening and operating.  The plaintiff contends that the Bill's safe harbor provision was amended to apply only to clinics "established <u>and operating</u>" by April 15, 2002, because the County Council learned that Helping Hand received its use occupancy permit from the County and its state license on April 15, 2002.  Joel Prell also claims that in late March 2002 he saw a

county car parked in the clinic's parking lot and a "a county worker using a measuring device to measure the distance from our facility to nearby buildings."  (*See* Pl.'s Mot. for Summ. J., Ex. 6, May 5, 2004 Joel Prell Aff. at ¶ 30.)[6]  Once Bill 39-02 was signed into law, the County cited Helping Hand and proposed to fine the clinic at a rate of $200.00 a day along with threatened criminal penalties for "fail[ing] to provide evidence that it was lawfully established and operating after 1 April, 2002 and before 16 April, 2002, pursuant to County Council Bill 39-02 sections 4C-101 and 4C-102, Article 4C, State Licensed Medical Clinics in order to obtain a six month exemption from the regulations."  (*See* Pl.'s Mot. for Summ. J., Ex. 16, "Baltimore County Uniform Code Enforcement Citation"; Ex. 18, "Final Order of the Code Enforcement Hearing Officer.")  Helping Hand challenged the citation and the proposed fine, but the County Code Enforcement Hearing Officer upheld the County's enforcement action (imposing only a $1000 civil penalty) after an August 12, 2002, hearing where it determined that the clinic was not "operating" on April 15, 2002, because while it was "doing everything leading up to the delivery of a service," it was not dispensing methadone on that date.  (*Id.* at 5-6.)  Helping Hand appealed the administrative hearing decision and then filed suit in this court.[7]

II.  *Standard of Review*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue

---

[6] Bill 39-02 contained provisions requiring that state-licensed medical clinics could not be located within 750 feet of any residentially zoned property line.

[7] According to counsel, the administrative appeal has been stayed.

as to any material fact and that the moving party is entitled to a judgment as a matter of
law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the

motion:

> By its very terms, this standard provides that the mere existence of *some* alleged
> factual dispute between the parties will not defeat an otherwise properly
> supported motion for summary judgment; the requirement is that there be no
> *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club,

Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all

reasonable inferences in her favor without weighing the evidence or assessing the witness'

credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002),

but the court also must abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal

quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and

citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  Summary judgment is

inappropriate when there clearly exist factual issues "that properly can be resolved only by a

finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477

U.S. at 250.

III.  *Collateral Estoppel as to Standing and Disability Issues*

In seeking summary judgment on its ADA claim, the plaintiff argues that the defendants have conceded both that Helping Hand has standing to pursue claims on behalf of its clients under Title II of the ADA, and that its clients are disabled.  The plaintiff supports its argument with language taken directly from the defendant's legal memorandum filed in support of its motion to dismiss.  It also argues that defendants are estopped from litigating these issues because they have been decided against them in prior litigation in this court.  *See Smith-Berch Inc. v. Baltimore County, Maryland,* 68 F.Supp. 2d 602, 617-18 (D.Md. 1999) (in an ADA suit brought by a private methadone clinic, the defendant Baltimore County did not dispute that the clinic's clients were "disabled individuals covered by the ADA" or that the clinic had standing to bring an ADA claim).  Although I determine that the defendants have not conceded the issues in the present case, and that they are not collaterally estopped from litigating the issues, I will hold, consistent with prior opinions, that the plaintiff has standing to bring claims under Title II of the ADA.  I also find a genuine issue of material fact as to whether the clinic's clients are disabled. *See*, e.g., *START, Inc. v. Baltimore County, Maryland,* 295 F.Supp.2d 569, 576 (D.Md. 2003); *Smith-Berch*, 68 F.Supp. 2d at 617-18; *see also MX Group, Inc. v. City of Covington,* 293 F.3d 326 (6th Cir. 2002); *Innovative Health Systems, Inc. v. City of White Plains,* 117 F.3d 37 (2nd Cir. 1997).

While the plaintiff is correct in noting that the defendant conceded the issues of standing and disability in a memorandum in support of their motion to dismiss,[8] the Fourth Circuit has

---

[8]The defendants' motion to dismiss stated: "The Court has expended a great deal of effort in previous litigation involving methadone and Title II of the Americans with Disabilities Act. *See Smith-Berch, Inc. v. Baltimore County, Maryland,* 68 F.Supp. 2d 602 (D. Md. 1999) and

indicated in an unpublished opinion that "legal memoranda, unlike pleadings or affidavits, do not

generally constitute binding judicial admissions."  *See Northern Ins. Co. of New York v.*

*Baltimore Business Comm., Inc.,* 68 Fed. Appx. 414, 421 (4th Cir. 2003) (citing *Martel v.*

*Stafford,* 992 F.2d 1244, 1248 (1st Cir. 1993)).  Here, it would be inappropriate to hold

defendants to the statement in the memorandum in support of the motion to dismiss, because I

denied the motion without prejudice, and stayed the case pending the outcome of an appeal in

the *Smith-Berch* case, *see* March 13, 2003 Order, following which the motion was not litigated.

In addition, to date, much of the parties' discovery effort has focused on whether the plaintiff's

clients are disabled, and I stated in an earlier ruling in this case that "[w]hether Helping Hand's

patients are 'individual[s] with a disability' under the ADA is a threshold issue in this litigation."

*A Helping Hand, L.L.C.,* 295 F.Supp. 2d 585, 591 (D.Md. 2003).

It also would be inappropriate to permit the plaintiff to employ offensive collateral

estoppel to prevent the defendants from litigating the issues of disability and standing.  Collateral

estoppel "forecloses the relitigation of issues of fact or law that are identical to issues which

have been actually determined and necessarily decided in prior litigation in which the party

against whom [collateral estoppel] is asserted had a full and fair opportunity to litigate."  *In re*

*Microsoft Corp. Antitrust Litig.,* 355 F.3d 322, 326 (4th Cir. 2004) (quoting *Sedlack v. Braswell*

*Servs. Group, Inc.,* 134 F.3d 219, 224 (4th Cir. 1998).  In *In re Microsoft Corp.*, the Fourth

Circuit embraced a strict rule for application of offensive collateral estoppel, holding that the

---

*Smith-Berch, Inc. v. Baltimore County, Maryland,* 115 F.Supp. 2d 520 (D.Md. 2000).  The
defendants don't want to waste any more of this Court's time.  Accordingly, the defendants
concede that plaintiff's anticipated clientele are disabled individuals covered by the ADA, *see*
*Smith-Berch, Inc.,* 68 F.Supp.2d at 617, and therefore do not dispute that plaintiff has standing to
sue on behalf of its clients.  *Id.* at 618."  *See* Def.'s Motion to Dismiss at 1.

issue or fact sought to be precluded must have been essential or "critical and necessary" to the

judgment in the prior proceeding, rather than merely "supportive of" the earlier judgment. 355

F.3d at 327. The court stated that in order to apply issue preclusion to an issue or fact, the

proponent must demonstrate that:

> (1) the issue or fact is identical to the one previously litigated;
> (2) the issue or fact was actually resolved in the prior proceeding;
> (3) the issue or fact was critical and necessary to the judgment in
> the prior proceeding; (4) the judgment in the prior proceeding is final
> and valid; and (5) the party to be foreclosed by the prior resolution
> of the issue or fact had a full and fair opportunity to litigate the issue
> or fact in the prior proceeding.

*Id.* at 326 (citations omitted). The case relied on by plaintiff to assert offensive collateral

estoppel, *Smith-Berch Inc. v. Baltimore County, Maryland,* 115 F.Supp.2d 520 (D.Md 2000), did

not proceed to a bench or jury trial, nor was it appealed. *Cf. Ritter v. Mount St. Mary's College,*

814 F.2d 986, 988 (4th Cir. 1987) (holding that the plaintiff was collaterally estopped from

relitigating findings of fact made by a trial judge during a bench trial). In fact, while the County

may have had an "opportunity" to fully litigate the issues of disability and standing, it conceded

these issues at the outset, and I relied on these concessions in making my determination that

genuine issues of material fact existed as to whether the County's zoning decisions violated the

ADA. Moreover, it would be unfair to hold the County to its concession of the disability and

standing issues in the *Smith-Berch* litigation, because the County did challenge these issues in a

later suit brought by a different methadone clinic. *See START, Inc.,* 295 F.Supp. 2d 569

(denying the County's motion to dismiss an ADA claim upon finding that methadone clinic's

allegations sufficiently demonstrated its patients were disabled as defined by the ADA). For the

above reasons, I have determined these issues are not appropriate for collateral estoppel.

*IV.  Standing*

In turning to the question of whether Helping Hand has standing to bring a Title II claim, I see no reason to depart from my earlier holdings that a methadone treatment clinic has standing to sue the County under the ADA.  *Smith-Berch Inc.,* 68 F.Supp.2d at 618; *START, Inc.,* 295 F.Supp. 2d at 576.  This finding is consistent with the opinions of other courts that have considered the issue.  *See, e.g., MX Group, Inc.,* 293 F.3d at 335 (holding that because a drug treatment provider presented evidence that it was denied a zoning permit "because it cares for and/or associates with individuals who have disabilities," the organization had standing to bring an ADA suit)*; Innovative Health Systems, Inc.,* 117 F.3d at 47-48 (reasoning that the ADA and the implementing regulations issued by the Department of Justice demonstrate Congressional intent that the Act extend to entities which are discriminated against based on their relationship with disabled individuals); *Oak Ridge Care Center, Inc. v. Racine County,* 896 F.Supp. 867, 871-72 (E.D.Wis. 1995) (same); *Pathways Psychosocial, et al., v. Town of Leonardtown, MD, et al.,* 133 F.Supp. 2d 772 (D.Md. 2001); *cf. Discovery House, Inc. v. Consolidated City of Indianapolis,* 319 F.3d 277, 281 (7th Cir. 2003), *cert. denied,* 540 U.S. 879, 124 S.Ct. 301 (2003)(distinguishing cases where drug treatment centers sought equitable relief under the ADA and holding that a private methadone clinic does not have standing to recover lost profits under the ADA).  Similarly, I find that Helping Hand has both constitutional and prudential standing to sue in its own right under the ADA, for equitable relief even if not for lost profits.[9]

_____

[9]Helping Hand filed a new complaint  against Baltimore County on behalf of individual patient plaintiffs designated as "John Does" on March 29, 2005, that includes the same counts and seeks the same relief as the present suit.  *See* Civil No. CCB-05-0844.  Given the overlapping claims and parties, it may be appropriate to consolidate these two complaints.  In any event, the addition of individual plaintiffs would only strengthen the standing analysis at this

*V. Title II of the ADA*

When Congress passed the Americans With Disabilities Act in 1990, its purpose was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. §§ 12101(b)(1).  Among the types of discrimination that Congress was most concerned with were "outright intentional exclusion" and "exclusionary qualification standards and criteria." *Id.* §§ 12101(a)(5). Congress's stated goal in eliminating these and other forms of discrimination against disabled individuals was "to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." *Id.* §§ 12101(a)(8).  As a remedial statute, the ADA should be construed broadly to effectuate its purposes.

―――――――――――――――

point.  As the court reasoned in *Innovative Health Systems,* a case where the plaintiffs included both the methadone clinic and several individual patients, Title II extends remedies to "'*any person* alleging discrimination on the basis of disability,'" and this broad language "'evinces a congressional intention to define standing to bring a private action under [Title II] as broadly as is permitted by Article III of the Constitution."  117 F.3d at 47 (citing 42 U.S.C. § 12133 and *Innovative Health Systems v. City of White Plains,* 931 F.Supp. 222, 237 (S.D.N.Y. 1996)). Similarly, Title III of the ADA specifically disallows discrimination against an "individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." *See also* 28 C.F.R. §36.205.  The preamble to 28 C.F.R. Part 36 explains that this statutory provision "was intended to ensure that entities such as health care providers, employees of social service agencies, and others who provide professional services to persons with disabilities are not subjected to discrimination because of their professional association with persons with disabilities."  56 Fed. Reg. 35544, 35559 (July 26, 1991).  During oral argument, defendants' counsel argued that under *Freilich v. Upper Chesapeake Health, Inc.,* 313 F.3d 205 (4th Cir. 2002), the plaintiff cannot establish third-party or associational standing under the ADA.  The *Freilich* court, however, was concerned with "generalized references" to association with or advocacy for disabled persons, *id.* at 216, whereas here, the plaintiff has alleged a direct and specific relationship to allegedly disabled persons exactly of the sort contemplated by Congress.  Finally, inasmuch as the defendants argue that the plaintiff does not have standing to recover lost revenue because such an award would not directly benefit its disabled clients, *see Discovery House Inc.,* 319 F.3d at 281, I need not reach that issue at this stage.

The plaintiff contends that in passing Bill 39-02 the defendants violated Title II of the

ADA.  Title II of the ADA prohibits state and local governments from discriminating against

individuals based on their disabilities.  It reads, in relevant part: "[N]o qualified individual with a

disability shall, by reason of such disability, be excluded from participation in or be denied the

benefits of services, programs, or activities of a public entity, or be subjected to discrimination

by any such entity." 42 U.S.C. §§ 12132.  The term "public entity" is defined by the ADA as any

state or local government, including "any department, agency, special purpose district, or other

instrumentality" of a state or local government.  *Id.* §§ 12131(1). The term "qualified individual

with a disability" is defined, in relevant part, as "an individual with a disability who, with or

without reasonable modifications to rules, policies, or practices ... meets the essential eligibility

requirements for the receipt of services or the participation in programs or activities provided by

a public entity." *Id.* §§ 12131(2).

*A.  Definition of "Disability"*

In order to establish disabled status under the ADA, a plaintiff must demonstrate: (1) a

physical or mental impairment that substantially limits one or more of the major life activities of

such individual; (2) a record of such an impairment; or (3) being regarded as having such

impairment.  42 U.S.C. §§ 12102.  The Supreme Court has held that the "substantially limits"

requirement indicates that an impairment must interfere with a major life activity

"considerabl[y]" or "to a large degree." *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184,

196-197, 122 S.Ct. 681, 691 (2002), and that the "impairment's impact must also be permanent

or long-term." *Id.* at 198 (internal citations and quotations omitted).  "The phrase major life

19

activities means functions such as caring for one's self, performing manual tasks, walking,

seeing, hearing, speaking, breathing, learning, and working."  28 C.F.R. § 35.104.  *See also*

*Bragdon v. Abbott,* 524 U.S. 624, 639, 118 S.Ct. 2196, 2205 (1998).

Defendants mount five attacks on the disability issue.  First, they argue that because

Helping Hand's clients receive methadone which "normalizes" their physical status and social

behavior, they are not impaired in carrying out major life activities, any more than the "average

person."  Second, they contend that Helping Hand has failed to demonstrate that its clients have

a "record of" a disability that substantially limits one or more major life activities.  Third, they

contest whether the plaintiff's clients were ever "regarded as" disabled under the ADA by the

County.  Fourth, they argue that because the plaintiff's clients pose a "significant risk" of harm

to the community, they should not be considered qualified disabled persons under the ADA.

Finally, they claim that because 42 U.S.C. § 12210(a) specifically excludes any "individual who

is currently engaging in illicit use of drugs, when the covered entity acts on the basis of such

use" from the definition of "qualified individuals with a disability," Helping Hand's clients do

not qualify as disabled individuals.

(1) *Methadone "Normalizes" Patients' Impairment*

Turning to the first issue, it is undisputed that opiate addiction may qualify as an

"impairment" provided the addict is not currently using illicit drugs.  *See* 28 C.F.R.§

35.104(4)(1)(ii) ("[t]he phrase physical or mental impairment includes . . .drug addiction"); *MX*

*Group, Inc.,* 293 F.3d at 341.  The defendants contend, however, based on the plaintiff's own

expert testimony, that taking methadone helps opiate addicts to "function" and "live a normal

life," *see* Defs.' Mot. for Summ. J., Ex. 2, Dec. 17, 2003 Deposition Transcript of Dr. Francis

20

Fernandes at 127; Ex. 5, April 6, 2004 Deposition Transcript of Page Gross at 67, and therefore

the clinic's patients are, at best, suffering from a transitory or short-lived impairment that does

not impede them from carrying out major life activities.  The defendants argue that the Fourth

Circuit does not recognize "temporary medical conditions" under the ADA, *see Pollard v.*

*High's of Baltimore, Inc.,* 281 F.3d 462, 468 (4th Cir. 2002) and *Halperin v. Abacus Tech.*

*Corp.,* 128 F.3d 191, 199 (4th Cir. 1997), and therefore the clinic's patients are not covered.

The cases relied on by the defendant are readily distinguishable from the facts presented

in this case.  Both *Halperin* and *Pollard* involved ADA claims against employers by  individual

employees suffering from back injuries which they claimed substantially limited their ability to

work.  The Fourth Circuit determined that the "nature and severity, " the "duration or expected

duration," and the "permanent or long term impact" of the impairment, in these cases, on-the-job

back injuries, did not render the persons disabled for the purposes of the ADA.  *See Pollard,* 281

F.3d at 468-69 (citing factors listed at 29 C.F.R. § 1630.2(j)(2)); *Halperin,* 128 F.3d at 199.  In

this case, the depositions and affidavits suggest that, far from suffering from "temporary medical

conditions," the clinic's clients experience severe and wide-ranging impairments.  Although

ameliorated by methadone, these impairments can persist even while the patients are receiving

treatment.[10]   The deponents describe opiate addiction as "a chronic, relapsing condition," (*See*

---

[10]Moreover, the Supreme Court clarified in *Sutton v. United Air Lines, Inc.,* 527 U.S. 471,
488, 119 S.Ct. 2139, 2149 (1999), a case relied upon by the defendants, that "use of a corrective
device does not, by itself, relieve one's disability."  Rather, the Court emphasized that,
notwithstanding corrective measures, a determination as to whether an individual is disabled
"depends on whether the limitations an individual with an impairment *actually* faces are in fact
substantially limiting."  *Id.*  Therefore, it may be true that "individuals who take medicine to
lessen the symptoms of an impairment so that they can function . . . nevertheless remain
substantially limited." *Id.*

Defs.' Mot. for Summ. J., Ex. 4, March 8, 2004 Christine Kelly Deposition Transcript at 2), and

state that, as a result of addiction, patients are unable to maintain their personal hygiene, keep a

job, interact with others, parent, or otherwise function normally.  (*See, e.g.,* Defs.' Mot. for

Summ. J., Ex. 2, Dec. 17, 2003 Dr. Francis Fernandes Deposition Transcript.)

According to the plaintiff, even with methadone treatment, "a significant number of methadone

patients have much more difficulty in maintaining employment, personal relationships,

maintaining hygiene and maintaining health requirements among other major life activities."

(*See* Pl.'s Response in Opp. to Defs.' Mot. for Summ. J., Ex. 2, May 28, 2004 Supp. Aff. of Dr.

Francis Fernandes at 2.)[11]  Controlling a disability does not necessarily mean removing a

---

[11]The defendants challenge the validity of the affidavits submitted by plaintiffs for three
reasons.  First, they argue that because the initial affidavits are based on "information and belief"
rather than "personal knowledge" as required by Fed. R.Civ. P. 56(e) they should not be
considered.  (*See* Def.'s Response in Opp. to Pl.'s Motion for Summ. J. at 4).  The plaintiff,
however, recognizing its mistake, submitted supplemental affidavits properly sworn as
statements made based on personal knowledge.  Fed.R.Civ.P. 56(e) specifically allows
"affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further
affidavits."  Therefore, I will consider the plaintiff's affidavits.  The defendants next argue,
however, that the second set of affidavits are "sham affidavits" submitted by the plaintiff in an
effort to contradict statements made in earlier depositions in order to raise a genuine issue of
material fact.  (*See* Def.'s Response in Opp. to Pl.'s Mot. for Summ. J. at 8) (citing *Hayes v. New
York City Dept. of Corrections,* 84 F.3d 614, 619 (2nd Cir. 1996).  While the defendants have
identified certain contradictions between deposition testimony and sworn statements made later
by the same person, even if I were to disregard the second affidavit by Dr. Fernandes, I would
find that the plaintiff has submitted enough evidence demonstrating disability to survive
defendants' motion for summary judgment.  Moreover, it is difficult to assess the significance of
the alleged contradictions given that both parties have provided only short excerpts of the
depositions.  It appears that the plaintiff's experts were merely clearing up prior testimony, rather
than purposefully creating issues of material fact. Finally, the defendants contend that the
plaintiff's experts do not discuss the principles or methodology that form the basis of their
opinions, and therefore, in accordance with *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509
U.S. 579 (1993), the court should not consider the experts' testimony.  Defendants' *Daubert*
objection is not dispositive, inasmuch I do not rely solely on the expert testimony to find that the
plaintiff has provided sufficient evidence to demonstrate there is a genuine issue of material fact
as to whether its clients are disabled.  Moreover, it is perfectly legitimate for the plaintiff's

disability, *EEOC v. J.H. Routh Packing Co.*, 246 F.3d 850, 855 (6th Cir. 2001), and methadone

alone will not cure the patients' problems.  Rather, in order to more effectively treat its clients'

addiction, the clinic provides psychological counseling, as is required by law.  Such treatment is

necessary to prevent relapse.  (*See, e.g., Id.,* Ex. 3, Supp. Aff. of Joel Prell at ¶¶ 11-16; Pl.'s

Reply Memo. in Support of Its Motion for Summ. J., Ex. 2, Second Supp. Aff. Page Gross at ¶¶

36-46; Pl.'s Mot. for Summ. J., Ex. 19, Fernandes Aff. at ¶¶ 23-30; *see also* Ex. 14, Deposition

of Sally Satel at 49-50 (agreeing that only a fraction of heroin addicts become fully productive

on methadone alone and therefore counseling is necessary)).

      The defendants contend that the plaintiff's experts have provided contradictory testimony

that once an addict is enrolled in a methadone treatment program: "[H]e can work. He can

support his family. He can take care of his babies.  His wife is happy. He is happy. Nobody's

house gets broken into.  Nobody gets mugged." (*See* Defs.' Response in Opp. to Pl.'s Mot. for

Summ. J., Ex. 2, January 30, 2004 Dr. Francis Fernandes Deposition transcript at 125.)

Moreover, the defendants' own expert states that "opiate addicts receiving methadone

maintenance are not significantly limited, by virtue of taking methadone, in any physical or

mental activity," rather, "methadone...relieve[s] symptoms and behaviors that interfere with

health and social function."  (*See* Defs.' Response in Opp. to Pl.'s Mot. for Summ. J., Ex. 8, Dr.

Sally Satel Aff. at 2.)   Additionally, the defendants provide expert opinion that the only heroin

addicts in treatment that qualify as disabled are those who suffer from "co-morbid physical

and/or psychological problems such as HIV, Bi-polar Disorder, or Schizophrenia, and that it is

"their co-morbid disorder which causes them to be disabled," not their opiate addiction.  (*See*

experts to base their opinions on their professional clinical experience, as they have done.

Defs.' Response in Opp. to Pl.'s Mot. for Summ. J., Ex. 12, Dr. Sheldon Glass Aff. at ¶ 8.)

Therefore, the defendants argue, individuals receiving methadone treatment can not be

considered substantially limited in a major life activity.

Caring for oneself is a major life activity.  *See Bragdon,* 524 U.S. at 639 (citing 42

U.S.C. § 12201(a), 45 C.F.R. § 84.3(j)(2), and 28 C.F.R. § 41.31(b)(2)); *Toyota Motor Mfg.,* 534

U.S. at 201-02 ("household chores, bathing and brushing one's teeth are among the types of

manual tasks of central importance to people's daily lives").  The plaintiff has provided evidence

that its clients are substantially limited in their ability to care for themselves absent methadone

and rehabilitative treatment, and that even with treatment they suffer from a chronic relapsing

illness.  (*See also* Pl.'s Mot. for Summ. J., Ex. 14, Dr. Sally Satel Deposition Transcript at 59-60)

(agreeing that some drug addicts who are not excluded because of current illegal drug use would

be considered disabled under the ADA.)  The problem with the position advanced by the

defendants is that if followed to its logical conclusion, narcotic addicts would face substantial

difficulty in ever obtaining treatment for their affliction, an outcome that is clearly at odds with

Congress' intent in passing the ADA.  As current drug users, narcotics addicts would be

unprotected from discrimination by the ADA and similar statutes.  It is well documented that

community residents often oppose the opening of drug rehabilitation programs, such as the one

operated by Helping Hand, in their neighborhoods because of fears that drug addicts will bring

increased criminal activity or an unsightly and dangerous element to the neighborhood.  *See,*

*e.g., Innovative Health Systems,* 117 F.3d at 49; *BAART,* 179 F.3d at 729; *MX Group, Inc.,* 293

F.3d at 329.  As a result of these fears, local government authorities have employed restrictive

zoning methods to prevent such clinics from opening in accessible locations.  *Id.*; *see also*

*START, Inc.,* 295 F.Supp.2d 569; *Smith-Berch, Inc.,* 115 F.Supp. 2d 520.  The case law

documenting these tensions demonstrates that the ADA, and similar statutes such as the

Rehabilitation Act and the Fair Housing Act, have provided essential legal protection to drug and

alcohol rehabilitation programs and their patients.  Yet, to follow the defendants' reasoning, once

admitted to rehabilitation programs, drug addicts still would not be protected because their

treatment renders them "normal" and able to perform major life activities.  Congress could not

have intended such an outcome when it explicitly recognized current and former participants in

drug rehabilitation programs as qualified individuals under the ADA.  *See* 42 U.S.C. §

12210(b).[12]     In other words, while the expert testimony does not conclusively establish

whether the clinic's patients are disabled, it is clear that Congress intended the ADA to extend to

participants in drug rehabilitation programs, such as the clinic at issue in this case.  *See* 42

---

[12] There is another related problem with the Defendant's reasoning.  The court finds that the plaintiff has provided evidence, sufficient to survive summary judgment, that its clients are substantially limited in a major life activity even when considering the ameliorative effects of methadone.  Nevertheless, it is worth noting that basic fairness and simple logic support a conclusion that the "corrected state" holding from *Sutton* should not apply in the same manner when the alleged discriminatory act relates to the denial or obstruction of access to the very ameliorative device that can improve the plaintiff's condition.  The petitioners' glasses may have completely corrected their condition, but United Air Lines was not charged with denying them access to glasses altogether.  Surely that would have changed the Court's analysis.  Although not reported, and thus only cited to expound upon the problem with Defendant's position, the court in *Denney v. Mosey Mfg. Co., Inc.* similarly recognized that taking *Sutton* too far could lead to an untenable conclusion. 2000 WL 680417 (S.D.Ind. 2000).  In *Denney*, where it was alleged that the employer interfered with or prohibited the diabetic plaintiff's ability to administer a shot of insulin, the court correctly reasoned that "it is inconceivable that such actions by an employer would be entirely beyond the reach of the ADA on the theory that the employee does not have a 'disability' under the ADA." *Id.* at 10.  It is not necessary to the outcome here today to address this legal question, so the court reaches no conclusion on this point.  It does, however, seem to be the better course - indeed, the logical course - to not allow a defendant to both obstruct plaintiffs' access to a needed "corrective measure" and then point to the ameliorative effects of that very measure to argue the plaintiff is not "disabled" under the ADA.

U.S.C. § 12210(b) ("Nothing in subsection (a) of this section shall be construed to exclude as an individual with a disability an individual who--(1) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use; (2) is participating in a supervised rehabilitation program and is no longer engaging in such use; or (3) is erroneously regarded as engaging in such use, but is not engaging in such use"); H.R. Conf. Rep. No. 101-596 at 64, *reprinted in* 1990 U.S.C.C.A.N. 565, 573 ("many people continue to participate in drug treatment programs long after they have stopped using drugs illegally, and . . . such persons should be protected under the Act."). *See also* 28 C.F.R. § 35.131(2) (tracking the language of 42 U.S.C. § 12210(b)).  Upon examining whether methadone clinic patients are covered by the ADA, the Sixth Circuit concluded that "in the context of a drug addiction impairment, merely because methadone has the intended effect of ameliorating the addiction, recovering drug addicts [do not] lose all protection under the ADA.  The statute belies any such contention." *MX Group, Inc.,* 293 F.3d at 339.

Other courts have employed similar reasoning to find that recovering alcoholics and other substance abusers enrolled in treatment programs and/or living in rehabilitation homes are disabled persons under the ADA and under similar statutes that share the same definition for disability as the ADA.  *See, e.g., Reg'l Econ. Comm. Action Prog., Inc. v. City of Middletown,* 294 F.3d 35, 47-48 (2nd Cir. 2002), *cert. denied,* 537 U.S. 813, 123 S.Ct. 74 (2002) (finding that the potential clients for a halfway house for recovering alcoholics would be deemed disabled under the ADA, the Fair Housing Act, and the Rehabilitation Act, because the clients "are unable to abstain from alcohol abuse without continued care; absent assistance, they cannot adequately

care for themselves."); *Oxford House Inc. v. Township of Cherry Hill,* 799 F.Supp. 450, 460 (D.N.J. 1992) (determining that the clients of a group home for recovering alcoholics and drug addicts were disabled under the Fair Housing Act because "alcoholism and drug addiction place severe limitations on people's lives . . . such limitations do not magically disappear at the moment that abstinence begins, but rather continue to affect a person's functioning at least through the early stages of recovery").  In finding that the clients of a rehabilitation program for recovering drug addicts were disabled under the Fair Housing Act, the Fourth Circuit specifically noted that the 1990 passage of the ADA, with its "explicit focus on successful rehabilitation and supervised programs assures us that Congress accepts the concept of a rehabilitated addict." *United States v. Southern Management Corp.,* 955 F.2d 914, 922 (4th Cir. 1992).  These cases are not directly analogous to the present case, in that each court found it significant that the recovering addicts could not live independently; they needed to live in a rehabilitative environment or they would suffer a relapse.   The courts found that public and private actions that prevented the recovering addicts from obtaining housing in a structured rehabilitative program were discriminatory.  *Reg'l Econ. Comm. Action Prog., Inc.,* 294 F.3d at 47-48; *Oxford House,* 799 F.Supp. at 460; *Southern Mgmt. Corp.,* 955 F.Supp. at 919.  Nonetheless, the reasoning in these decisions, with its focus on the rehabilitative requirements of addicted individuals and Congress's intent that individuals participating in supervised rehabilitation programs not be excluded from the disability category, is instructive, particularly where, as here, both defendants' and plaintiff's experts have stated that recovering heroin addicts, such as the plaintiff's clients, require both methadone and psychological counseling in order to not relapse. In summary, while the plaintiff has submitted sufficient evidence demonstrating that its clients are

disabled to preclude summary judgment under the first prong of the disability definition codified at 42 U.S.C. § 12102.

(2) *"Record of" Disability*

The clinic also relies on the second prong of the definition of "disability," contending that its clients have "a record of" such disability. "The phrase has a record of such impairment means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 28 C.F.R. § 35.104. The defendants argue that the plaintiff has merely averred that it treats individuals with "histories of alcohol and drug dependence," and that it has provided no evidence to support this contention.[13] (*See* Defs.' Mot. for Summ. J. at 15.) This is not correct. The plaintiff has offered evidence that, prior to admittance into Helping Hand's program, individuals must demonstrate a record of drug abuse for more than one year. (*See, e.g.,* Pl.'s Mot. for Summ. J., Ex. 12, May 6, 2004 Aff. of Page Gross (explaining that the clinic's clients all have a history of at least one year or more of continuous use of opiates and that some patients also have records of their disability from other programs through which they have received treatment); Defs.' Response in Opp. to Pl.'s Mot. for Summ. J., Ex. 3, April 6, 2004 Page Gross Deposition Transcript at 9 (explaining that prior to admitting an individual into the treatment program, the clinic's medical director needs to be satisfied that the individual has a history of drug

---

[13]The defendants maintain the only record the plaintiff has submitted is evidence that prior to entering the methadone treatment program, its patients must test positive for opiates. According to the defendants, this should disqualify the clinic's clients as current illegal drug users, rather than establish that they are disabled. It is perfectly reasonable and permissible under the ADA for drug rehabilitation programs to test for drug use by potential and current participants. *See* 28 C.F.R. § 35.131(c). Moreover, the plaintiffs rely on other indicators, not merely the initial urine test, to determine whether potential clients have a record of drug use.

use that would indicate that he would benefit from this type of treatment); Defs.' Response in Opp. to Pl.'s Mot. for Summ. J., Ex. 6, "Consent for Release of Confidential Information" (Helping Hand consent form authorizing the clinic to receive and provide information used for "[v]erification of past treatment and compliance to facilitate admission and treatment planning"); Pl.'s Mot. for Summ. J., Ex. 6, May 5, 2004 Aff. of Joel Prell at ¶ 99 (explaining that the medical director documents a history of substance abuse by obtaining written verification from a doctor, judicial entity, medical records, other treatment facility, or written verification from family members, employers, or others who would have knowledge of the patient's addiction). In addition, a number of the clinic's clients transferred from other methadone programs where they had been in treatment for a year or more. They sought out Helping Hand because they wished to continue treatment at a closer, more convenient location. (Pl.'s Mot. for Summ. J., Ex. 6, May 5, 2004 Aff. of Joel Prell ¶ 48 -49.) This is precisely the type of evidence that other courts have deemed sufficient to establish a record of disability. *See, e.g., MX Group,* 293 F.3d at 339 (stating that proof of a history of opiate addiction "can come from letters from other treatment facilities or social service agencies or probation/parole officers, jails, courts, and/or parents").[14] Moreover, there is evidence in the record that individuals with such a history are substantially limited in major life activities. *See id*. at 339-340; (*see also* Pl.'s Reply in Supp of Mot. for Summ. J., Ex. 1, Supp. Aff. of Francis Fernandes ¶ ¶ 23-30; *Id*. at Ex 2, Supp. Aff. of Page Gross ¶ ¶ 7-17, 46-48; *and Id*. at Ex 3., Supp. aff. of Joel Prell ¶ ¶ 9-13.) Accordingly, the defendants are not entitled to summary judgment on the second

---

[14] The addition of the individual plaintiffs could help to clarify this issue. For example, during oral argument, plaintiff's counsel stated that one of the John Doe plaintiffs was one of the first seven clients to enroll at Helping Hand and he came as a transfer from another treatment program.

prong of the definition.

(3) *"Regarded As" Disabled*

In addition, the plaintiff has provided significant evidence suggesting that its clients were regarded by the defendants as having a disability, and were discriminated against on that basis. Under the "regarded as" prong, rather than trying to determine whether an individual presently suffers from a substantially limiting impairment, "the Court must determine whether Defendants perceived Plaintiff's clients as being disabled and discriminated against them on that basis." *MX Group, Inc.,* 293 F.3d at 340 (citing *Parry v. Mohawk Motors of Michigan, Inc.,* 236 F.3d 299, 310 (6th Cir. 2001)).  *See Sutton,* 527 U.S. at 489 (explaining that a person may be "regarded as" disabled when: (1) a covered entity believes that a person has a physical impairment that substantially limits one or more major life activities, or; (2) if a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.)  As one Helping Hand counselor explained, "no matter how peaceful or law abiding [the patients] are, [they] are seen as unclean, deviants, who have criminal intent, and are unemployable if it is known that they are taking methadone." ( Pl.'s Mot. for Summ. J., Ex. 12, May 6, 2004 Page Gross Aff. at ¶ 27.) When Helping Hand hosted an open-house event in mid-March, prior to its opening for business and before Bill 39-02 was passed, about 100 people attended to protest the clinic's presence in the community.  According to one news article, Helping Hand's president Joel Prell  "was accused of bringing a criminal element into the neighborhood and his promise to have a security guard on duty during clinic hours was considered proof of that."  (*See* Pl.'s Mot. for Summ. J., Ex. 17, March 20, 2002 "A Bitter Battle," Baltimore JewishTimes.com; *see also* Def.'s Response in Opp. to Pl.'s Mot. for Summ. J., Ex. 7, Ziegler Aff. at 2.)  Protestors were described as outraged about the possibility

of a methadone clinic operating within a mile of two schools; one person carried a sign proclaiming "No More Crime." (*Id.,* Ex. 17)   In addition, the plaintiff has provided evidence that County Council members attended community meetings where similar concerns were expressed by citizens, and that the County defendants acted against the plaintiff as a result of the community pressure. *See supra* discussion Part I.   In similar cases, courts have determined that community animus such as this demonstrates that a clinic's patients were regarded as disabled and discriminated against on that basis. *See, e.g., MX Group, Inc.,* 293 F.3d at 341-42.   According to the regulations, "a person who is denied services or benefits by a public entity because of myths, fears, or stereotypes associated with disabilities would be covered under" the regarded as prong, "whether or not the persons' physical or mental condition would be considered a disability under the first or second test in the definition."   28 C.F.R., pt. 35, App. A to 28, § 35.104 at 518-519.   The Sixth Circuit reasoned that because the ADA "evinces a general recognition of substance abuse as a disease... where the discrimination results from unfounded fears and stereotypes that merely because Plaintiff's potential clients are recovering drug addicts, they would necessarily attract increased drug activity and violent crime to the city, such discrimination violates the ADA." *MX Group, Inc.*, 293 F.3d at 342 (internal quotations omitted) (citing *Teahan v. Metro-North Commuter R. Co.,* 951 F.2d 511, 518 (2nd Cir. 1991).   Similar motivations appear to have influenced the defendants.   Accordingly, the plaintiff has provided sufficient evidence demonstrating that its potential clients were regarded as disabled and discriminated against as a result to overcome the defendants' motion for summary judgment on the third prong of the definition.

(4) *Significant Risk*

The defendants contend, however, that even if Helping Hand's patients satisfy the definition

for disabled codified at 42 U.S.C. § 12102, they pose a "significant risk" to the community, and therefore, they should not be considered disabled individuals.  *See BAART v. City of Antioch,* 179 F.3d 725, 736 (9th Cir. 1999) (explaining that individuals who pose a significant risk to the health or safety of others may not be deemed qualified individuals under the ADA) (citing *School Board of Nassau County v. Arline,* 480 U.S. 273, 107 S.Ct. 1123 (1987)).  Although I have indicated twice before that "[g]eneralities about the criminal behavior of heroin addicts…will not satisfy the standard" of demonstrating that a methadone clinic is directly associated with "severe and likely harms to the community," *see START, Inc.,* 295 F.Supp.2d at 578 and *A Helping Hand, LLC,* 2004 WL 392873 at 2, the defendants continue to rely on irrelevant evidence in asserting that Helping Hand's clients pose a significant risk to the community.   For example, the defendants mischaracterize the plaintiff's witness's statements in response to questioning during a deposition that prior to receiving treatment, heroin addicts commit 365 crimes per year, or a crime a day—presumably a reference to their illegal drug use, *see* Defs.' Mot. for Summ. J., Ex. 4, March 8, 2004 Chris Kelly Deposition Transcript at 129—to assert that because Helping Hand has the capacity to serve 325 patients, it therefore "attracts 325 patients to [the clinic] who commit a crime a day," and that this "threat did not exist before Helping Hand moved into the neighborhood." (Defs.' Mot. for Summ. J. at 24.)  The defendants' conjecture has no bearing on the significant risk analysis.  Prior to the passage of Bill 39-02, the defendants were aware of a 2002 Baltimore study that determined that "addiction-related crime decreases significantly as a result of effective treatment," such as the methadone treatment program proposed by plaintiff.  (*See* Pl.'s Response in Opp. to Defs.' Mot. for Summ. J., Ex. 1, *Steps to Success: Baltimore Drug and Alcohol Treatment*

*Outcomes Study* at 5.)[15]  Moreover, the defendants concede that since the clinic opened the crime

rate has decreased in Baltimore County and in the area surrounding 116 Slade Avenue, *see* Pl.'s

Mot. for Summ. J., Ex. 9, Crime Report, and they offer no relevant evidence to refute the claim made

repeatedly by the plaintiff that methadone treatment clinics actually decrease the threat to the

community because addicts who receive treatment are less likely to engage in crime.  (*See, e.g.,* Pl.'s

Mot. for Summ. J., Ex. 12, May 6, 2004 Page Gross Aff. at ¶ 42.)   They also do not challenge

several statements on the record that since the clinic opened there have been no complaints from the

community.  (*See, e.g.,* Pl.'s Reply Mem. In Support of Mot. for Summ. J., Ex. 2, Page Gross Second

Supp. Aff. at ¶ 35; Ex. 10, Feb. 25, 2004 Kathleen Rebbart-Franklin Deposition Transcript at 15,

explaining that after the clinic opened "the opposition basically dissolved" and that there were no

reports of anything bad happening in the community as a result of the clinic's presence.)  Even when

examining the crime statistics known to the County Council at the time Bill 39-02 was passed, the

defendants have failed to demonstrate that the plaintiff posed a significant risk to the community.

    (5) *Current Drug Use*

    Finally, the defendants argue that because the plaintiff has admitted that some of its clients

fail drug tests, none of them should be considered disabled, because the ADA explicitly excludes

coverage for individuals who are "currently engaging in the illegal use of drugs." *See* 42 U.S.C.

§12210(a); *Shafer v. Preston Mem. Hosp. Corp.,* 107 F.3d 274, 279-80 (4th Cir. 1997)(noting that

---

    [15] In another example of reliance on unpersuasive evidence, despite being aware of the
2002 Baltimore study, the defendants rely on a 1991 study of the effectiveness of methadone
treatment programs in New York City, Philadelphia, and Baltimore that determined the group of
617 patients engaged in crime 69.3 days per year, to assert that the County Council legitimately
feared that Helping Hand's presence in the community would automatically increase crime, and
that this threat continues to exist today.

"the provision is intended to apply to a person whose illegal use of drugs occurred recently enough to justify a reasonable belief that a person's drug use is current" and therefore only "persons who have refrained from using drugs for some time are protected under the [ADA]") (quoting H.R. Conf. Rep. No. 101-596 at 64, *reprinted in* 1990 U.S.C.C.A.N. 267, 573).[16]   Helping Hand has explained that as a result of random urine sampling, the clinic "[has] determined that the majority of [its] patients, approximately 75%, are not currently illegal drug users."  (*See* Pls.' Reply Memo. in Support of Its Mot. for Summ. J., Ex. 2, Page Gross Second Supp. Aff. at 5.)  The clinic has stated that they do not tolerate illegal behavior, and that they discharge clients from the program for not following the rules.  (*See* Motion to Compel, Ex. 2, Fernandes Deposition Transcript at 118.)  That some clients relapse "should not defeat the rights of the majority of participants in the rehabilitation program who are drug-free and therefore disabled under [the statute]." *Innovative Health Systems, Inc.,* 117 F.3d at 48 (citing 42 U.S.C. § 12210(b)(2)).

In summary, the plaintiff has provided sufficient evidence to overcome defendants' motion for summary judgment. It has not established as a matter of law, however, based on factual disputes in the record, that its clients are disabled.   Accordingly, neither party is entitled to summary judgment on Count 1 based on the disability issue.[17]

---

[16]*Shafer* is not analogous to this case in that *Shafer* established that an employer may properly terminate an employee who is engaged in illegal drug use *before* that person is receiving rehabilitative treatment, not after an employee is enrolled in rehabilitation and refraining from illegal drug use.  107 F.3d at 279-80.

[17] I recently denied defendants' motion to compel discovery of the plaintiff's patient and business records because this information would not be probative of their "significant risk" theory.  *See* docket entry no. 66.  Now, in light of the complaint filed by individual plaintiffs and the disagreements between experts on the issue of "disability," the need to permit some limited discovery of individual records, with appropriate privacy protections, will be discussed with counsel.

B.  *Intentional Discrimination*

The parties have also moved for summary judgment on the claim that the defendants intentionally discriminated against the plaintiff by passing Bill 39-02 and imposing zoning permit requirements intended to thwart the clinic's ability to open and operate in the community.  In order to establish disability discrimination in violation of the ADA, a plaintiff must prove that: (1) he is a qualified individual with a disability; (2) he is otherwise qualified for the benefit in question; and (3) discrimination due to his disability was a motivating factor in his exclusion from the benefit. *Baird v. Rose,* 192 F.3d 462, 467-69 (4th Cir. 1999) (emphasizing that a plaintiff must demonstrate that disability was a motivating cause, although not necessarily the sole cause, of discrimination). In order to establish intentional discrimination,[18] Helping Hand must demonstrate, by either direct or circumstantial evidence, "that a decision to deny a 'benefit' was motivated by unjustified consideration of the disabled status of individuals who would be affected by the decision." *Pathways Psychosocial, et al., v. Town of Leonardtown, MD, et al.,* 133 F.Supp. 2d 772, 781 (D.Md. 2001) (citation omitted).  Contrary to the defendants' assertion, the ADA does apply to local zoning decisions.  *See, e.g., START, Inc.,* 295 F.Supp 2d. at 576 ("Numerous precedents establish that the administration of zoning laws is a "service, program, or activity" within the meaning of [42 U.S.C. § 12132].") (citations omitted); *Tsombanidis v. West Haven Fire Dept.,* 352 F.3d 565, 574 (2nd Cir. 2003); *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 45-46 (2nd Cir. 2002), *cert. denied,* 537 U.S. 813, 123 S.Ct. 74 (2002); *BAART,* 179 F.3d at 732 .  When evaluating whether a government entity intentionally discriminated against an organization, courts must

---

[18]The plaintiff does not presently rely on other theories that may be available under the ADA, including disparate impact and failure to provide reasonable accommodation.  *See Pathways,* 133 F.Supp. 2d at 781.

consider:

> (1) the discriminatory impact of the governmental decision;
> (2) the decision's historical background; (3) the specific sequence
> of events leading up to the challenged decision; (4) departures
> from the normal procedural sequences; (5) departures from normal
> substantive criteria and (6) legislative or administrative history
> including contemporaneous statements by members of the
> decision-making body.

*Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 266-68, 97 S.Ct. 555, 564-65

(1977).  The plaintiff has provided persuasive evidence supporting each of the above factors, and

therefore the defendant is not entitled to summary judgment as to its intentional discrimination claim

under Count I.

As for discriminatory impact, Helping Hand is the only facility that has been cited by the

County in connection with Bill 39-02 and the only entity required to participate in a hearing as a

result. Further, the plaintiff has identified language in the Bill specifying that the Act would apply

only to medical clinics "lawfully established and operating after April 1, 2002," which appears

narrowly tailored to affect Helping Hand. (*See* Pl.'s Mot. for Summ. J., Ex. 3, Bill No. 39-02.)

Helping Hand received its license to operate from the state at approximately 1:00 p.m. on April 15th,

at which point it immediately began contacting patients, scheduling appointments, and ordering

methadone.  A few hours later, the Baltimore County Council passed Bill 39-02.  Although the Bill

initially was drafted to provide all facilities "licensed" between April 1 and the date of passage a six

month grace period to allow a request for a variance, the plaintiff alleges that upon learning Helping

Hand had received its license that day, the County Council modified the Bill so that the grace period

was only available to licensed facilities "operating" by the effective date of the Act.  (*See* Pl.'s Mot. for Summ. J., Ex. 6, May 5, 2004 Aff. of Joel Prell at ¶ ¶ 64-67.)  The plaintiff claims that the Council modified the language after Councilman Kamenetz called the state licensing bureau and the Helping Hand clinic and determined that the plaintiff received its license that day and was open for business.   As a result of this change, the plaintiff was cited for violating Bill 39-02 and assessed a fine of $ 200 per day because the County determined that while Helping Hand may have been "established" it was not actually "operating" on April 15, 2002.[19]

Moreover, the plaintiff has proffered that Bill 39-02 was passed against a historical backdrop of community opposition and hostility towards methadone treatment clinics. *See, e.g., Smith -Berch,* 68 F.Supp.2d at 610-16; *START, Inc.,* 295 F.Supp. 2d at 574-76.  Two community meetings were held in mid-March where citizens voiced their concerns about the appropriateness of locating methadone clinics in residential areas, the impact on property values, and fears about increased crime and the proximity of the clinics to schools.  (*See* Pl.'s Mot. for Summ. J., Ex. 17, March 14, 2002, "Pikesville Residents Gear Up to Fight Two Proposed Methadone Clinics" and March 20, 2003, "A Bitter Battle," news articles from Baltimore JewishTimes.com.) The community members were described as "angry and frustrated" about the proposed clinics. (*Id.*)  County Councilman Kevin Kamenetz, who drafted Bill 39-02, attended these meetings and spoke about the limited ability of the County to stop the methadone clinic from opening.  (*Id.*)  Before the clinic began

---

[19] After a hearing on the matter, a Code Enforcement Hearing Officer enforced the citation and fine, reasoning that because the clinic was not yet dispensing methadone, it was not "operating" and therefore not eligible for the six month grace period.  (See Pl.'s Mot. for Summ. J., Ex. 18, Final Order of the Code Enforcement Hearing Officer.)  As a result of the County's actions and the uncertainty as to its ability to operate, the plaintiff contends that it encountered difficulty attracting clients, retaining staff, and otherwise serving its clientele.

operating it hosted an open house where approximately 100 area residents turned out to protest its

existence.  *See* Pl.'s Mot. for Summ. J., Ex. 5, March 19, 2002, Owings Mills Times, "Protestors

crash clinic open house.") As described above, citizens spoke out during these gatherings about their

fears that the clinic would attract drug addicts to the community and thus automatically increase

crime.   In similar cases, courts have found that "a decision made in the context of strong,

discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers

personally have no strong views on the matter." *Innovative Health Systems,* 117 F.3d at 49.  *See*

*also United States v. Borough of Audobon,* 797 F.Supp. 353, 361 (D.N.J. 1991)(finding that

discriminatory intent of government officials may be established where animus towards a protected

group is a significant factor in the community opposition to which the officials are responding),

*aff'd,* 968 F.2d 14 (3rd Cir. 1992); *Support Ministries for Persons with AIDS, Inc. v. Village of*

*Waterford, N.Y.,* 808 F.Supp. 120, 134 (N.D.N.Y. 1992) (same).

The procedural history of Bill 39-02 also supports plaintiff's contention that the County

defendants intentionally discriminated against Helping Hand.  The Bill was enacted as an emergency

measure to take effect immediately, rather than the usual 45 days after enactment.  Moreover,

although Councilman Kamenetz explained that it is "very rare that we would have a law that is

retroactive," Bill 39-02 applied retroactively to all state medical facilities licensed as of April 1,

2002.  (*See* Pl.'s Mot. for Summ. J., Ex. 2, Pikesville Meeting Transcript at 13.)  Although the Bill

contained a six month grace period, as explained above, the provision was drafted and subsequently

enforced in such a way as to specifically exclude Helping Hand.

The defendants maintain that Bill 39-02 was a legitimate response to community concerns

about traffic and congestion that could result from a private methadone treatment clinic expected

to serve a large number of clients.  The Fourth Circuit has acknowledged that "municipal officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate," *see Smith v. Town of Clarkston,* 682 F.2d 1055, 1064 (4th Cir.1982), and that "government officials may conceal discriminatory intent by claiming that they relied upon objective, neutral criteria such as parking regulations." *Bryant Woods Inn, Inc. v. Howard County, Maryland,* 911 F.Supp. 918, 929 (D.Md. 1996), *aff'd,* 124 F.3d 597 (4'th Cir. 1997).

While one could argue that Bill 39-02 did not depart from normal substantive criteria applied in zoning regulations in that it ostensibly addressed concerns that "state-licensed medical facilities" operating beyond normal weekday hours could cause "potential disruption and inconvenience to surrounding residential communities by inhibiting ingress and egress to surrounding neighborhoods, affecting the safe flow of vehicular traffic, creating parking difficulties in surrounding neighborhoods, and generally adversely impacting the quality of life in these surrounding areas," *see* Pl.s' Mot. for Summ. J., Ex. 3, Bill 39-02, the plaintiff has provided evidence indicating these criteria may have been pretextual reasons to cover up the Bill's discriminatory focus on Helping Hand.  In a March 27, 2002 memorandum related to a draft version of Bill 39-02 from Thomas J. Peddicord, Jr., the legislative counsel for the County to Councilman Kamenetz, Peddicord described a "traffic concern" as the primary "justification" for Bill 39-02. (*See* Pl.'s Mot. for Summ. J., Ex. 7, March 27, 2002 Peddicord Inter-Office Memorandum.)  Mr. Peddicord also relayed his efforts to contact various facilities to confirm if they indeed had night and weekend hours "in order to document the bill's justification as stated in the preamble." (*See* Id.)  These efforts were subsequent to the drafting of the legislation and its preamble which stressed the County Council's findings that

certain facilities' non-traditional hours caused disruption. (*See* Pl.'s Mot. for Summ. J., Ex. 3, Bill-39-02.)  This memorandum also contains a veiled reference to the effect of the Bill on the Helping Hand clinic, stating that "the Law Office is still concerned about the vesting issue, particularly with regard to the facility that does not require a use and occupancy permit and has already...held an 'open house' for the community." (*Id.*)

Further, it is undisputed that the site selected by the plaintiff, 116 Slade Avenue, was already an established medical setting.  The building is situated next to a completely fenced and guarded National Guard Armory, and is surrounded by other medical and office buildings, including a Baltimore County police substation.  The site already had been zoned and approved as a medical setting with sufficient parking.  (*See* Pl.'s Mot. for Summ. J., Ex 6, May 5, 2004 Joel Prell Aff. at ¶ ¶ 9-12.)  In fact, during what appeared to be a last minute attempt by the County to prevent Helping Hand from receiving its state license to operate, the County required the plaintiff to submit a site plan on April 11, 2002, in order to demonstrate the site had adequate parking, despite the fact that previously the County had indicated that the site was already appropriately zoned for a medical office use.  (*Id.* ¶ 36; *see also* ¶ ¶ 37-38, stating that deposition testimony shows that both Mr. Arnold Jablon, Director of Baltimore County Permits Department and Councilman Kamenetz were in contact with the state licensing division.)  When Helping Hand complied with the request, the County rejected the site plan because of concerns unrelated to the previously claimed concern about adequate parking.  (*Id.*)  Significantly, the defendant does not counter the plaintiff's assertion that the clinic "in no way inhibits ingress and egress to surrounding neighborhoods," or affects any of the other concerns identified by the Bill.  (*See* Pl.'s Mot. for Summ. J., Ex. 12, Page Gross Aff., ¶ 12) (explaining that a dead end street near the clinic prevents ingress or egress to the residential

neighborhood); (*Id.*, Ex. 6, May 5, 2004 Joel Prell Aff. at ¶¶ 13-16 (explaining that due to the clinic's location it is unlikely that any patients or staff members would park in the surrounding neighborhoods and that since the clinic's opening, he is not aware of any patients or employees parking in the residential streets).[20]

In sum, the facts and evidence submitted by the plaintiff represent "legislative or administrative history including contemporaneous statements by members of the decision-making body" that raise a genuine issue of material fact as to whether discriminating against the plaintiff and its disabled clients was a motivating factor in passing Bill 39-02.  The record does not conclusively support the view that the Bill was drafted to alleviate general concerns about parking, congestion, or disruption to residential neighborhoods.  Rather, the procedural history, the circumstances surrounding the Bill's enactment, and the Bill's substantive provisions—particularly its application to clinics "established *and operating*" after April 1, 2002—strongly indicate that the Bill was specifically designed to prevent Helping Hand from providing services to its disabled clients. Therefore, the defendants are not entitled to summary judgment on the intentional discrimination claim.  Similarly, however, in light of the factual disputes remaining on several issues, the plaintiff has not established as a matter of law that intentional discrimination against disabled individuals was a significant motivating factor behind the defendants' enactment and enforcement of Bill 39-02.

---

[20] As further evidence that the County targeted Helping Hand when drafting Bill 39-02, Joel Prell, President of Helping Hand, states that in late March he saw a county car parked in the clinic's parking lot and "a county worker using a measuring device to measure the distance from our facility to nearby buildings."  (Pl.'s Mot. for Summ. J., Ex. 6, May 5, 2004 Joel Prell Aff. at ¶ 30.)  The plaintiff contends the County took these measurements in order to specifically target the Helping Hand clinic when drafting the provision that "[a] state-licensed medical clinic may not be located within 750 feet of any residentially-zoned property line." (See Pl.'s Mot. for Summ. J., Ex. 3, Bill 39-02, Art. 4C-102(A)(2)(I).)

VI.  Conclusion

For the foregoing reasons, I conclude that neither party is entitled to summary judgment on Count I.  The plaintiff has standing to pursue its ADA claims, yet it has not established as a matter of law that its clients are disabled and that the defendants intentionally discriminated against it on that basis.

A separate Order follows.


  September 30, 2005                                           /s/                              
              Date                                     Catherine C. Blake
                                                United States District Judge