IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

A HELPING HAND, LLC            :
                               :
   v.                          :   CIVIL NO. CCB-02-2568
                               :
BALTIMORE COUNTY, MD, ET AL.   :

...o0o...

**MEMORANDUM**

This memorandum will address the plaintiffs' motions in limine to exclude evidence relevant to the "significant risk" defense and to exclude evidence of alleged current illegal drug use by Helping Hand patients, as well as the defendants' motion to exclude evidence of post-enactment crime data.

I. Significant Risk

Under the regulations implementing Title II of the ADA, a person who presents a "direct threat" to the health and safety of others may not be a "qualified individual with a disability." 28 C.F.R. §35.104.[1]  The Supreme Court has characterized this exception, in the employment context, as an affirmative defense that an entity may raise when it has acted on the basis of a

---

[1] Section 35.104 itself only states that a "qualified individual with a disability means an individual with a disability who, with or without reasonable modifications...meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." The Appendix then states that in determining the meaning of "essential eligibility requirements," "where questions of safety are involved, the principles established in § 36.208 of the Department's regulation implementing title III of the ADA, to be codified at 28 CFR, part 36, will be applicable. That section implements section 302(b)(3) of the Act, which provides that a public accommodation is not required to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of the public accommodation, if that individual poses *a direct threat* to the health or safety of others." 28 C.F.R. §35.104, Appx. A (emphasis added).

person's disability.  *See Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 78 (2002).[2]

The "direct threat" or "significant risk" test requires consideration of several factors: the nature, duration, and severity of the risk, and the probability that the potential injury will occur. *See School Bd. of Nassau County v. Arline*, 480 U.S. 273, 288 (1987); *Montalvo v. Radcliffe*, 167 F.3d 873, 877 (4th Cir. 1999).  "The existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the treatment or accommodation...." *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998).  However, the defendant "must not base its calculus on stereotypes or generalizations about the effects of a disability but rather must make 'an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available evidence.'" *Montalvo*, 167 F.3d at 876-77 (quoting 28 C.F.R. § 36.208(c)); *START, Inc. v. Baltimore County, MD*, 295 F.Supp.2d 569, 578 (D.Md. 2003); *see also Doe v. County of Centre, PA*, 242 F.3d 437, 448 (3rd Cir. 2001) (Congress intended that

---

[2] Some courts have questioned whether the direct threat defense actually exists outside of the employment and public accommodation contexts.  *See Hargrave v. Vermont*, 340 F.3d 27, 36 (2d Cir. 2003). The Ninth Circuit in *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725 (9th Cir. 1999), assuming that it applied to a Title II claim, placed the burden on the plaintiffs to "demonstrate that it is likely that [they] do not pose a significant risk to the health or safety of the community." *Id.* at 737; *but see Hutton v. Elf Atochem North America, Inc.*, 273 F.3d 884, 893 (9th Cir. 2001).  The Fourth Circuit, however, has suggested that defendants bear the burden of showing that plaintiffs pose such a direct threat.  *See Montalvo v. Radcliffe*, 167 F.3d 873, 876-877 (4th Cir. 1999) ("When determining whether an individual poses a 'direct threat,' a place of public accommodation must not base its calculus on stereotypes or generalizations...").  This view is supported not only by *Echazabal*, but also by statements in the Act's legislative history.  *See* H.R.Rep. No. 101-485(II), at 56 (1990) ("The employee must identify the specific risk that the individual with a disability would pose."); *id.*, pt. III, at 46 ("If the applicant is otherwise qualified for the job, he or she cannot be disqualified on the basis of a physical or mental condition unless the employer can demonstrate that the applicant's disability poses a direct threat to others in the workplace."); *see also Branham v. Snow*, 392 F.3d 896, 906 (7th Cir. 2004) (noting circuit split on issue, but adhering to prior holding placing burden on employer to show direct threat posed by employee); *Hargrave*, 340 F.3d at 35-36.

"the ADA's prohibitions on disability determination require an individualized determination as to the significance of risk underlying the direct threat exception, both by entities evaluating disabilities and by courts judging the actions of those entities") (citing H.R. Rep. No. 101-485(III), at 45 (1990)).[3]

The plaintiffs' motion in limine to exclude evidence offered only to support the "significant risk" defense must be granted. As an initial matter, the direct threat defense is only available where a defendant, in denying a service to a plaintiff, actually based its actions on that risk as demonstrated by individualized, objective evidence available at the time. *See Montalvo*, 167 F.3d at 876-77. In enacting Bill 39-02, the County purportedly acted on the basis of its concerns about the traffic, noise, and parking problems that would allegedly be created by the various entities newly grouped under the definition of "state-licensed medical facilities." These included not only methadone clinics and other drug and alcohol abuse treatment programs, but also ambulatory care centers, diagnostic centers, birthing centers, and dialysis satellite units, which quite obviously do not present the "significant risk" on which the County now relies. When asked during the motions hearing on June 9, 2006 what indication exists in the legislation itself that its adoption was a response to any "significant risk" posed by Helping Hand, or by methadone clinics in general, the County's attorney pointed only to the preamble, which expressed concerns applicable to all covered facilities.[4] (Hr'g Tr. 72, June 9, 2006.) *See also*

---

[3] In addition, if an entity concludes that such a "significant risk" exists, it "must then ascertain 'whether reasonable modifications of policies, practices, or procedures will mitigate that risk.'" *Montalvo*, 167 F.3d at 877 (citing 28 C.F.R. 208(c)).

[4] The Preamble to Bill 39-02 reads:
WHEREAS, the Baltimore County Council finds that, in order to protect the health, safety and welfare of the county's citizens, it is necessary to provide

Memorandum from Thomas J. Peddicord, Jr. to The Honorable Kevin B. Kamenetz, Mar. 27, 2002, Pls.' Mot. for Summ. J., Ex. 7.  When asked how the 750-foot setback addresses the concern about drug users coming into the community, he identified nothing.  (Hr'g Tr. 66-67, 89).[5]  The only other piece of evidence relied on – setting aside the community "alarm" – was the presence in the legislative file of a Baltimore City study on heroin showing that methadone users commit "64 percent less crime after 12 months."  (Hr'g Tr. 85).[6]  In short, having publicly relied on reasons that may prove to be pretextual,[7] the County cannot now claim to have made an

---

      suitable locations for certain types of state-licensed medical facilities while limiting their adverse secondary effects on the community; and
      WHEREAS, the County Council finds that certain state-licensed medical facilities frequently operate outside the traditional five-day-per-week, eight-hour-per-day schedule, causing potential disruption and inconvenience to surrounding residential communities by inhibiting ingress and egress to surrounding neighborhoods, affecting the safe flow of vehicular traffic, creating parking difficulties in surrounding neighborhoods, and generally adversely impacting the quality of life in these surrounding areas; and
      WHEREAS, in order to lessen and control these effects, it is necessary to place certain restrictions on the location of certain types of state-licensed medical facilities...

Pls.' Mot. for Summ.J., Ex. 3, Bill 39-02.

[5] This supports the conclusion that, assuming the County did make findings that a "significant risk" existed, the bill did not reflect a genuine effort to ascertain whether "reasonable modifications of policies, practices, or procedures" could have mitigated that risk. *Montalvo*, 167 F.3d at 877.

[6] *Steps to Success: Baltimore Drug and Alcohol Treatment Outcomes Study* (Pls.' Opp'n to Defs.' Mot. for Summ. J., Ex. 1.)  Even if some of the additional literature referenced by the defendants was in existence as of April 2002, it has not presented any evidence that the County actually considered, much less relied on, such literature in enacting the bill.

[7] In making this assessment, the court is not relying on the public statements of Councilman Kamenetz at the public meeting at Pikesville High School on April 23, 2002, although they support this ruling; the court instead relies on the language of the bill itself, the Peddicord memo, and a complete absence of any evidence of a pre-enactment objective risk assessment.  In any event, the County's attorney acknowledged that, despite Councilman Kamenetz's guarded rhetoric at the Pikesville High School meeting, the "elephant in the living

individualized assessment based on objective medical or other evidence that Bill 39-02 was necessary to protect against a "direct threat" posed by Helping Hand and its patients, or by methadone clinics generally.

Moreover, even to the extent Bill 39-02 was in fact motivated by such perceived risks, the court has, at several points, indicated that the evidence proffered or forecasted by the defendants on this issue consists of generalities and speculation insufficient as a matter of law for a jury to consider in assessing the existence of any specific, severe and likely harm to the community associated with the operation of Helping Hand, or with methadone clinics generally. *See Helping Hand, LLC v. Baltimore County, MD,* 2004 WL 392873 at *2 (D.Md., Mar. 2, 2004); *Helping Hand, LLC v. Baltimore County, MD*, 2005 WL 2453062 at *15 (D.Md., Sept. 30, 2005) ("*Helping Hand V*"); *see also START*, 295 F.Supp.2d at 578-79. Much of the literature referenced by the defendants merely discusses drug addiction or the link between drug use and crime, and even those writings that discuss the behavior of methadone users do not sufficiently illustrate the specific risks posed by the presence of a methadone clinic in a particular community. *See, e.g.,* James Q. Wilson, *Thinking about Crime* (1985), Defs.' Mot. for Summ.J., Ex. 10C; John C. Ball & Alan Ross, *The Effectiveness of Methadone Maintenance Treatment* (1991), Defs.' Mot. for Summ.J., Ex. 9; *see also Abbott v. Bragdon*, 163 F.3d 87, 90 (1st Cir. 1998) (scientific literature relied on by defendant was "too speculative or too tangential" to create genuine issue of material fact as to significant risk defense); *Doe v. County of Centre*, 242 F.3d at 449 (criticizing the district court's reliance on "bland and generalized set of statistics,

---

room" was that Bill 39-02 was enacted in response to concerns regarding "what to do with regard to people who are actively using drugs coming into the community." (Hr'g Tr. 65.)

lacking in individual specificity").[8]  In addition, the subjective concerns of the community members around the time of Bill 39-02's passage, inasmuch as the County has not shown that they were based on objective or scientific evidence, are likewise insufficient in this regard.  *See Bragdon*, 524 U.S. at 649 (defendant's subjective "belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability").[9]

The County might also intend to present at trial the testimony of members of the community surrounding Helping Hand regarding their experiences since the clinic opened, and the testimony of two expert witnesses regarding their experiences with another methadone clinic. (*See* Depositions of James Tracey, E. Annette Tracey, Paula B. Mazor, Donald P. Mazor, Michael Gimbel, and Sheldon Glass). First, inasmuch as the County seeks to prevent the plaintiffs from presenting post-enactment crime data to rebut its direct threat defense, it would be

---

[8] This is not to say that such literature can never be considered as part of a pre-enactment, individualized, objective assessment of risk.  *Cf. Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1263 (4th Cir. 1995) (noting that hospital considered Center for Disease Control studies as part of individualized objective assessment of risk posed by HIV-positive surgeon).  At the motions hearing, the County's attorney essentially argued that the County was entitled to rely on the "generality" that drug users commit more crimes than other citizens in concluding that the presence of a methadone clinic would likely increase crime rates in nearby residential areas. (Hr'g Tr. 82.)  Without a consideration of other factors such as the security precautions taken by methadone clinics, the actual character of the affected neighborhoods, the impact of restricting accessibility to clinics on overall crime rates, etc., "[g]eneralities about the criminal behavior of heroin addicts such as the defendants have presented simply will not satisfy the standard." *START*, 295 F.Suppp.2d at 578 (citing *Doe v. County of Centre*, 242 F.3d at 449); *see also* H.R. Rep. No. 101-485(III), at 45 ("Decisions are not permitted to be based on generalizations about the disability but rather must be based on the facts of an individual case...The purpose of creating the "direct threat" standard is to eliminate exclusions which are not based on objective evidence about the individual involved.")

[9] Such evidence might be relevant, however, to the "regarded as" prong of the definition of disability under the ADA.

inconsistent for the County to present such post-enactment anecdotal evidence in support of that defense.  Even to the extent such evidence would be relevant to the ongoing enforcement of Bill 39-02, this testimony does not support the existence of a "significant threat" posed by Helping Hand.  The community members discuss isolated minor incidents and express subjective concerns about potential threats, but their experiences overall belie any contention that serious harms have occurred due to Helping Hand's presence.  Likewise, the testimony of Mr. Gimbel and Mr. Glass, which concern the experiences of a different methadone clinic, probably does not even support that a "significant risk" existed in that case.  In the case of Helping Hand, the statistical and anecdotal data strongly suggest that its presence has *not*, in fact, posed a "significant risk" to the community.

In sum, the County has not demonstrated that the evidence it would present at trial would constitute a legally sufficient basis on which the jury could find in favor of its direct threat defense.  Therefore, the probative value of any evidence it presents solely in support of this defense would be substantially outweighed by the risk of jury confusion or prejudice.  Accordingly, such evidence will be inadmissible pursuant to Fed.R.Evid. 403.  If evidence relevant to this issue is presented at trial for any other purpose, the County is barred from relying on it to argue or suggest that the plaintiffs are not entitled to the protections of the ADA because they posed a "significant risk" or "direct threat" to the community.[10]

---

[10] In terms of the ramifications of this holding, the court cannot see how the law would allow the County to argue to the jury, to the extent it is shown that the bill was motivated by community concerns regarding the risks posed by Helping Hand's patients, that those concerns were reasonable or nondiscriminatory outside of the "direct threat" defense.  *See* 28 C.F.R. §35.104, Appx. A (the stringent standard of the "direct threat" defense is "essential if the law is to achieve its goal of protecting disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to legitimate concerns, such as

II. Current Illegal Drug Use

Similarly, evidence of current illegal drug use, if offered only to show that the plaintiffs are not protected by the ADA, will not be admitted. An individual only loses protection on the basis of current illegal drug use "when the covered entity acts on the basis of such use." *See* 42 U.S.C. § 12210(a); *Discovery House, Inc. v. Consolidated City of Indianapolis*, 43 F.Supp.2d 997, 1001 (N.D. Ind. 1999); Hr'g Tr. 64 (County attorney acknowledging requirement that entity act on basis of drug use).[11] For the reasons stated above, the County cannot now argue that the passage of Bill 39-02 was based on the "current drug use" of Helping Hand's patients.[12] *See Discovery House*, 43 F.Supp.2d at 1001-02.

Moreover, the County's evidence in support of its argument that Helping Hand's patients engage in current drug use is legally insufficient. As the court has already stated, evidence that a certain percentage of the clinic's current patients fail its random drug tests cannot operate to defeat the rights of the drug-free remainder of the patients, or of the clinic. *Helping Hand V*, 2005 WL 2453062, at *16 (citing *Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 48 (2d Cir.1997)). Likewise, the requirement that a new client must test positive for

---

the need to avoid exposing others to significant health and safety risks"). In other words, if the plaintiffs show that Bill 39-02 was motivated by community stereotypes or generalizations regarding methadone users, and those users have a disability under the ADA, the County cannot argue that those stereotypes were somehow rational or nondiscriminatory.

[11] *See also Salley v. Circuit City Stores, Inc.*, 1997 WL 701302, at *8 (E.D.Pa., Oct. 29, 1997) (analyzing whether employee was actually terminated on basis of current drug use or for other reasons).

[12] Prior to the motions hearing on June 9, 2006, the court was not aware the County even intended to make such an argument, which is entirely contrary to the objective language of the bill itself, the bill file, and the public pronouncements of the bill's sponsors. (*See* Hr'g Tr. 64-65.)

8

opiates to gain admission to Helping Hand, which is mandated by law, cannot be used to establish that the clinics' patients as a whole are "currently engaged in illegal drug use." First, the mere fact that the patients take such a test manifests their intent to *cease* their drug abuse, meaning that "continuing use" is not "a real and ongoing problem." *Cf. Shafer v. Preston Mem. Hosp. Corp.*, 107 F.3d 274, 279 (4th Cir. 1997). Second, even if the initial urinalysis indicates recent drug use, that does not necessarily mean that the patient is "currently" using drugs for the entire term of their treatment, which can take several months or years. *Cf. id.* at 280. Third, those patients who transfer to Helping Hand from other methadone clinics need not test positive for opiates. (*See* Hr'g Tr. 76) (County attorney conceding that such individuals would not be exempted from ADA protection under § 12210(a)). Finally, the County's argument, if taken to its logical conclusion, might strip all drug treatment facilities of ADA protection, which would run counter to the Act's letter and spirit. *See* 42 U.S.C. § 12210(b)(2); *see also Discovery House*, 43 F.Supp.2d at 1001.

Accordingly, for all the above reasons, the County is barred from using evidence pertaining to the clinic's initial urinalysis screening or its random drug tests to argue that Helping Hand is not entitled to the protections of the ADA on the basis of current drug use, even if such evidence is admitted for other purposes.

III. <u>Post-enactment Crime Data</u>

The County has argued that the plaintiffs should be prohibited from introducing post-enactment crime data. To the extent such data might have been presented to rebut the County's argument that the patients pose a "significant risk" to the community, it would no longer be

9

necessary due to the court's ruling above.  *See also Bragdon*, 524 U.S. at 650 (evidence pertaining to risk must have been available at the time of defendant's decision at issue).  To the extent such evidence may possibly be relevant in some other fashion, for example as to the "regarded as" prong or the ongoing enforcement of Bill 39-02, the court will address its admissibility at the appropriate time.

    A separate Order follows.


<u>July 14, 2006</u>                                               <u>      /s/       </u>
Date                                                            Catherine C. Blake
                                                                    United States District Judge